# EXHIBIT B

**JASON NULL**
**as Vendor**

**and**

**SCC SPV I, LLC**
**as Purchaser**

---

**ASSET PURCHASE AGREEMENT**

---

**Dated August 5, 2024**

This Asset Purchase Agreement ("**Agreement**") is made this 5th day of August, 2024

BETWEEN:

**Jason Null**
3108 N. Hills Blvd.
Corinth, MS 38834

- and –

**SCC SPV I, LLC**
("**Stilwell**")
874 Broadway, #807
New York, NY 10003

WHEREAS:

I. Jason Null has carried on the business of being a recording artist, musician, songwriter and composer as a member of the group "Saving Abel" ("**Vendor**");

II. Vendor performed on and recorded the master sound recordings of musical compositions having the titles set forth on Schedule "A" attached hereto (the "**Label Masters**") and collects artist royalties derived from the exploitation of the Masters ("**Artist Royalties**") from Capitol Music Group ("**UMG**") pursuant to a recording agreement pursuant to which Skiddco Music, LLC ("**Skiddco**") furnished Vendor's services to UMG (jointly and severally, all agreements related thereto, the '**Recording Agreements**");

III. Vendor, as songwriter, has written or co-written the musical compositions set out on Schedule "B" attached hereto (the "**Compositions**") and Vendor collects all of the worldwide "writer's share" of public performance income from the Compositions as a member of ASCAP ("**ASCAP**") ("**ASCAP Writer's Share Income**");

IV. Vendor collects writer royalties derived from the exploitation of the Compositions ("**Writer Royalties**") from [BMG entity] ("**BMG**") pursuant to the copublishing agreement between Vendor and BMG's predecessor-in-interest PWMP Acquisiiton I, LLC dated as of April 14, 2008 (the "**BMG Agreement**")

V. Vendor collects all of Vendor's worldwide digital performance royalties from the digital exploitation of the master recordings set out on Schedule "C" from SoundExchange, Inc. ("**SoundExchange**") ("**SoundExchange Income**");

VI.      Vendor wishes to sell and Stilwell (the "**Purchaser**") wishes to purchase all rights in and to the Artist Royalties, the Compositions, the Writer Royalties, the ASCAP Writer's Share Income and the SoundExchange Income received on or after June 1, 2024  (the "**Cash Date**") and such other rights in the Purchased Assets (as defined below) as detailed herein;

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements herein contained, the parties hereto agree as follows:

**PURCHASE AND SALE OF PURCHASED ASSETS**

1. <u>Purchase and Sale</u>. Upon the terms and subject to the conditions of this Agreement:

a.       At Closing and effective as of the Effective Date, Vendor shall sell, assign, transfer, set over and convey to Purchaser, and Purchaser shall purchase, acquire and accept from Vendor the Purchased Assets (as defined below) in consideration of the payment of Nine Hundred and Forty Thousand United States Dollars (US$ 940,000) (the "**Purchase Price**") to be made by Purchaser to Vendor by wire transfers of funds to the following account designated by Vendor:

> Bank Name: Regions Bank
> SWIFT Code: UPNBUS44
> ABA#: 062005690
> Account Name: Jason Null
> Account Number: 0216953304

b.       The Purchase Price shall be payable less any sums, royalties, income, or other earnings of any nature, kind, or description paid or credited to or received by Seller from and after the Cash Date through the Closing, and less the Preliminary Advance, the Broker Fee and any unrecouped balances. Five percent (5%) of the Purchase Price will be held back by Purchaser and released upon Purchaser's direct receipt from each third-party payor (including BMG, SoundExchange and ASCAP) of the accounting statement and royalty payment due under the applicable agreement for the first accounting period ending after the Closing.  Further an additional ten percent (10%) of the Purchase Price will be held back by Purchaser pending resolution of payment direction as between UMG and Skiddco with respect to mater recording royalties.  Notwithstanding the foregoing to the contrary, an amount equal to Fifteen Thousand Dollars ($15,000) out of the Purchase Price (the "**Preliminary Advance**") has been paid by Purchaser to Vendor previously. Without limiting the foregoing, subject to a letter of direction from Seller, an amount equal to Twenty Thousand Dollars ($20,000) (the "**Broker Fee**") will be deducted from the Purchase Price and paid by Purchaser directly to Tom Lipsky and Bob Chiappardi on Vendor's behalf, solely as an accommodation to Vendor and Vendor shall indemnify and hold Purchaser harmless with respect thereto.

c.       Except for the Purchase Price, Vendor and Purchaser agree that Purchaser shall not be required to make any additional payments of any nature to Vendor or any other person for, or in connection with, the acquisition, exercise or exploitation of rights relating to the Purchased Assets pursuant to this Agreement except as specifically provided in this Agreement.  Further, if there is any unrecouped balance(s) held by any third party that reduces payments associated with the Purchased Assets following the Cash Date, Purchaser shall be entitled to deduct the

amount of any such balance(s) from the Purchase Price and/or demand that Vendor reimburse Purchaser an amount equal thereto.

d. At Closing and effective as of the Effective Date, all right, title and interest in the Purchased Assets shall be transferred to the Purchaser. "**Purchased Assets**" means the following assets, rights and property of the Vendor:

    i.    all right, title and interest to Vendor's interests in the Artist Royalties as outlined in the Recording Agreements, including, without limitation, the rights to receive income and statements, audit Skiddco and UMG as applicable;

    ii.    all right, title and interest to Vendor's interests in the Writer Royalties as set forth in the BMG Agreement, including, without limitation, the rights to receive income and statements, audit BMG and the like;

    iii.    subject only to the BMG Agreement, all right, title and interest in and to the Compositions, including, without limitation, the copyright therein and thereto and all extensions, renewals, reversions and other rights thereof and appurtenant thereto;

    iv.    all ASCAP Writer's Share Income earned from the Compositions as set forth on Schedule "B" attached hereto;

    v.    All SoundExchange Income from the master recordings set forth on Schedule "C" attached hereto;

    vi.    all renewals, modifications and extensions of the underlying agreements giving rise to the royalty streams related to the Purchased Assets as outlined above;

    vii.    all reversionary and recapture rights in the Purchased Assets now known or hereafter coming into force;

    viii.    all audit rights related to the Purchased Assets for income generated or received after the Cash Date;

    ix.    all royalties and income or accounts receivable arising from the exploitation of the Purchased Assets that are received during any periods commencing on or after the Cash Date, including any income received by Vendor on or after the Cash Date; and

    x.    subject to applicable laws and to the extent available and in possession and control of the Vendor, all royalty statements, records and files relating solely and specifically to above; provided however that where by law the Vendor is required to retain a royalty statement, book or record, it shall retain such item and deliver to the Purchaser a copy thereof;

4

all for the life of copyright or the term of such rights and any renewals and extensions thereof (whether presently available or subsequently available as a result of intervening legislation) throughout the World, and all of the proceeds from the foregoing received during any periods commencing on, and after, the Cash Date.

e. The Compositions and the names of the songwriters of the Compositions, their respective song writing share of the Compositions and their current music publishers or administrators are set forth in Schedule "B."

f. At Closing, Purchaser assumes all liabilities and obligations of Vendor in respect of all federal and provincial income tax liabilities in connection with any royalties, income or other monies received by Purchaser (and any of Purchaser's licensees, distributors or assignees) on or after the Cash Date in connection with the income received from the Purchased Assets.

g. It is understood that the Purchaser is not assuming, nor shall it be liable for any liabilities or obligations of the Vendor (whether accrued, absolute, contingent or otherwise) which exist prior to the Cash Date or which arise thereafter as a result of any act or omission of Vendor prior to the Cash Date (the "**Excluded Liabilities**") including, without limitation:

    i. all liabilities or obligations with respect to federal, state or provincial income or other taxes related to income received by Vendor prior to the Cash Date; and

    ii. any and all claims, suits, demands, actions or proceedings, whether made before or after the Cash Date and/or Closing, with respect to any creation, use, sale or exploitation of the Purchased Assets and the underlying Masters and Compositions.

i. The consummation of the transactions contemplated under this Agreement (the "**Closing**") shall take place remotely via the exchange and delivery of documents in pdf or similar format via electronic mail and/or other digital means, on the day on which all of the conditions precedent to each party's obligations set forth hereunder have been satisfied or waived, or at such other time and place as Purchaser and Vendor mutually agree. The Closing shall be effective (and the possession and control of the Purchased Assets shall vest in Purchaser) as of the Closing Date and all transactions and deliveries at the Closing shall be deemed to have occurred simultaneously. The Closing Date shall be the date on which Closing occurs (the "**Closing Date**").

2. <u>Conditions to Closing</u>     The Closing will be subject to the following conditions precedent:

a. Conditions precedent to the obligation of the Purchaser to close:

    i. satisfaction or compliance with the material terms and conditions of this Agreement including that all representations and warranties of the Vendor contained in this Agreement (including the Schedules and Exhibits) are complete, true and correct in all material respects as of the Closing Date other

5

Case 3:25-cv-00256    Document 1-2    Filed 03/04/25    Page 6 of 27 PageID #: 24

than such representations and warranties as are made as of another specified date, which shall be complete, true and correct as of such date;

ii. at the time of Closing on the Closing Date, all necessary steps and proceedings of the Vendor and its directors or members (if applicable) will have been taken to permit the Purchased Assets to be duly transferred to the Purchaser.

iii. Vendor's delivery to Purchaser of documents executed by: (i) ASCAP; (ii) Capitol Music Group, or their respective licensees or assigns if applicable; (iii) Skiddco, LLC, or their respective licensees or assigns if applicable; (iv) [BMG entity] or their respective licensees or assigns if applicable; and (v) SoundExchange (all "**Third Party Agreements**" by such "**Third Parties**") each consenting to the transfer of the Purchased Assets and agreeing to pay all royalties and income to the Purchaser, such documents to be satisfactory to Purchaser in its sole judgment.

iv. at the time of Closing on the Closing Date, all necessary steps and proceedings of the Purchaser and its directors will have been taken to permit the Purchased Assets to be purchased by the Purchaser and to authorize the execution and delivery of this Agreement by the Purchaser;

v. the board of directors or managers of the Purchaser will have approved the transaction contemplated herein and the execution of this Agreement;

vi. at the time of closing on the Closing Date, the Purchased Assets will be transferred to the Purchaser free and clear of any claims, liens, mortgages, charges, pledges, security interests and encumbrances whatsoever; provided that, if applicable, Vendor may deliver separate no-interest letters of intent or acknowledgments, in a form reasonably satisfactory to the Purchaser, duly executed by each secured party or registrant, whereby each such secured party or registrant agrees, upon the satisfaction of terms reasonably acceptable to the Purchaser, to release and discharge the Purchased Assets from any and all security interests held by such secured party or registrant;

vii. Vendor shall cause Vendor's spouse, [name], to sign the spousal consent attached hereto as Exhibit C and by this reference incorporated herein; and

viii. no legal or regulatory action or proceeding shall have been commenced by any person that has the effect of enjoining, restricting, delaying or prohibiting the purchase and sale of the Purchased Assets or the right of the Purchaser to acquire the Purchased Assets hereunder.

b. Conditions precedent to the obligation of Vendor to close:

i. Vendor shall have received the Purchase Price on the Closing Date;

6

ii.  at the time of Closing on the Closing Date, all necessary steps and proceedings of the Purchaser and its shareholders or members (if applicable) will have been taken to permit the Purchased Assets to be purchased by the Purchaser and to authorize the execution and delivery of this Agreement by the Purchaser; and

iii.  the necessary personnel of the Purchaser will have approved the transaction contemplated herein and the execution of this Agreement.

## 3. REPRESENTATIONS AND WARRANTIES OF THE VENDOR

Vendor hereby represents and warrants to Purchaser as follows:

a. <u>No Material Adverse Effect</u>. Vendor has all powers and all licenses, authorizations, consents and approvals required to carry on its business as now conducted except where the failure to be so licensed, qualified or in good standing would not have a Vendor Material Adverse Effect. "**Vendor Material Adverse Effect**" or other similar phrase including the word "material" with respect to Vendor or the Purchased Assets shall mean any condition, circumstance, change in or effect on the condition (financial or otherwise), assets, liabilities, business, operations or prospects of Vendor that, individually or in the aggregate with any other condition, circumstance, change in or effect thereon, results in (1) a material adverse effect upon the validity, binding effect or enforceability of this Agreement or a material adverse effect upon the Purchased Assets, or (2) a material adverse effect upon the ability of any Vendor to perform its or her respective obligations under this Agreement, jointly and severally.

b. <u>Governmental Authorization</u>. The execution, delivery and performance by Vendor of this Agreement does not require any notice to, action or consent by or in respect of, or filing with, any governmental authority.

c. <u>Artist Authorization</u>. Vendor represents that Vendor's shares in and to the Purchased Assets are confirmed and not subject to modification with respect to any coauthors of any musical compositions or master recordings, including, without limitation, with respect to Jared Weeks, and that no such person shall have any rights to the Purchased Assets or in connection with this Agreement.

d. <u>Other Authorization</u>. Other than as set forth explicitly herein, the execution, delivery and performance by Vendor of this Agreement does not require the consent or approval of parties to the Third Party Agreements or any other persons. Without limiting the foregoing, Vendor represents and warrants that BMG and/or its affiliates, assigns, licensees and/or successors in interest have waived any and all continuing rights to anything other than the copublishing interest pursuant to the BMG Agreement and that BMG shall have no continuing right to any Writer Royalties and that Purchaser shall have no obligation of any kind to BMG. With respect to the BMG Agreement, Vendor shall cause BMG and/or its successor-in-interest to pay all Writer Royalties with respect to Compositions owned by such entities to Purchaser following the Cash Date pursuant to the letter of direction approved by Purchaser. Vendor represents and warrants that no other entities need be

7

contacted to assure full payment of all Writer Royalties to Purchaser. Vendor represents and warrants that no other person, including without limitation, Jared Weeks has any rights with respect to the Purchased Assets or otherwise in connection herewith.

e.  Recording Agreement and Artist Royalties.  Vendor shall cause Skiddco and/or its successor-in-interest to pay all Artist Royalties with respect to the Recording Agreement to Purchaser following the Cash Date.  Vendor shall cause UMG, or their respective licensees or assigns if applicable to pay all Artist Royalties with respect to the Recording Agreement owned by such entity to Purchaser following the Cash Date.  Vendor represents and warrants that no other entities need be contacted to assure full payment of all Artist Royalties to Purchaser.

f.  Non-Contravention. The execution, delivery and performance by Vendor of this Agreement does not and will not: (i) contravene or conflict with or constitute a violation of any provision of any law or regulation binding upon or applicable to Vendor, which contravention, conflict or violation could reasonably be expected to have a Vendor Material Adverse Effect; (ii) contravene or conflict with or constitute a violation of any judgment, injunction, order or decree binding upon or applicable to Vendor, which contravention, conflict or violation could reasonably be expected to have a Vendor Material Adverse Effect; (iii) constitute a default under any underlying agreement or give rise to any right of termination, cancellation or acceleration of any right or obligation of Vendor or to a loss of any benefit relating to the Purchased Assets; or (iv) result in the creation, imposition or violation of any lien or security interest on the Purchased Assets (except for any lien in favor of Purchaser).

g.  No Undisclosed Material Liabilities.  There are no material liabilities related to the Purchased Assets of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, and there is no existing condition, situation or set of circumstances that could reasonably be expected to result in such a liability.

h.  Unencumbered Title. Vendor has good, valid, and marketable title to all of the Purchased Assets free and clear of any and all security interests, liens, mortgages, pledges, conditional sale and/or other title retention agreements, covenants, restrictions, reservations or other burdens, encumbrances or charges of any kind or nature whatsoever. All of the Purchased Assets and each of them are freely assignable to Purchaser, or Purchaser's designee as from the Closing Date. Vendor has not assigned any right to collect income from the exploitation of the Purchased Assets.  Upon Closing, Purchaser shall have good, valid, and marketable title to all of the Purchased Assets free and clear of any and all security interests, liens, mortgages, pledges, conditional sale and/or other title retention agreements, covenants, restrictions, reservations or other burdens, encumbrances or charges of any kind or nature whatsoever.

i.  Litigation. There is no claim, action, suit, investigation or proceeding, of which Vendor has received notice, pending or, threatened, before any governmental authority or arbitrator, which has or could have a Vendor Material Adverse Effect.  There have been no claims made by any person with respect to, and no actions, suits or other proceedings

8

relating to Vendor or the conduct of its business, which could reasonably be expected to have a Vendor Material Adverse Effect.

j.  Compliance with Laws. Vendor is not in violation of, has not violated, and is not under investigation with respect to and has not been threatened to be charged with or given notice of any violation of, any law, rule, ordinance or regulation, or judgment, order or decree entered by any governmental authority, which could reasonably be expected to have a Vendor Material Adverse Effect.

k.  Compliance with Third Party Agreements.  Vendor is not in violation of and has not violated any of Vendor's agreements with any Third Parties.

l.  Carrying on Business.  The Purchased Assets have, up to the Closing Date, been maintained by the Vendor in the normal and ordinary course and consistent with past practices and there have been no events or occurrences which might reasonably be considered to have a Vendor Material Adverse Effect.

m.  Not Insolvent or Bankrupt.  The Vendor and its members, shareholders, directors and officers (as applicable) are not insolvent, have not proposed, assigned its assets or entered into any arrangement with creditors and are not subject to any bankruptcy or analogous proceedings in any jurisdiction throughout the World which might, in each case, reasonably be considered to have a Vendor Material Adverse Effect.

n.  Intellectual Property. Schedules "A", "B," and "C" fully and accurately disclose all of the Purchased Assets being purchased by Purchaser hereunder. As of the Closing Date, none of the Purchased Assets infringe upon the rights of any person, firm or corporation, whether under copyright or otherwise; no exercise of any of the rights in the Purchased Assets by the Purchaser and its licensees shall infringe upon the copyright or any other rights of any third party; Vendor has not received any communication alleging that, nor has any knowledge prior to the Closing Date that, any part of the Purchased Assets infringes or misappropriates the rights of any third party and no third party is infringing upon any of the proprietary rights in the Purchased Assets.  No party has, prior to Closing, been granted, or has acquired, any rights in and to the Purchased Assets or any income derived from the Purchased Assets which would in any way diminish or impair Purchaser's acquisition of the Purchased Assets hereunder.

o.  Status of Third Party Agreements. As of the Closing Date, the Third Party Agreements are: (a) in full force and effect and, prior to the execution of this Agreement, Vendor has all rights under the Third Party Master Agreements to assign the Purchased Assets to Purchaser; (b) to the extent available, the copies of the Third Party Agreements and all royalty statements as provided by Vendor to Purchaser are true and correct copies; (c) there have been no amendments or modifications to any of the Third Party Agreements other than as disclosed to Purchaser in writing; (d) the Purchased Assets are not subject to any claim of off-set for any other liability or obligation on and after, the Closing Date; and (e) the Vendor is in compliance with each of the Third Party Agreements. The consummation

9

of the transactions contemplated by this Agreement shall not constitute a default under any Third Party Agreement or give rise to any right of termination,

p. <u>Agreements in Full Force</u>. None of the Third Party Agreements have expired or been terminated, there are no sums owed by Vendor to any parties to any Prior Agreement, there are no existing security interests registered against Vendor in relation to any Prior Agreement, there are no rights to negotiate, first refusal or right to match held by parties to any Prior Agreement as of the Closing Date and there are no restrictions under any Third Party Agreement on Vendor's right to assign the Purchased Assets.

q. <u>No Brokers</u>. Except for solely the recipients of the Broker Fee, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of Vendor who might be entitled to any fee or commission from Purchaser or any of its affiliates upon consummation of the transactions contemplated by this Agreement.

r. <u>Other Information</u>. This Agreement and each representation or warranty by Vendor and any statement, certificate or information furnished or to be furnished, prior to the Closing Date, by Vendor, its agents, representatives and/or affiliates in connection with the transactions intended and/or covered hereby does not, after reasonable consideration and due diligence knowingly contain any untrue statement of material fact, or knowingly omit or will omit to state a material fact necessary to make the statement contained herein not misleading.

s. <u>No Advances</u>. No person or entity, including but not limited to the parties to any third party agreements have paid to Vendor, or any person, firm or corporation on behalf of Vendor any payments constituting advances or bonuses or other payments chargeable against or deductible from Purchased Assets which are presently unearned or unpaid, and Purchaser shall be entitled to be paid and to collect all income from any exploitation of the Purchased Assets received on or after the Cash Date.

t. <u>Audits of Third Parties</u>. Vendor represents and warrants that no audits of any third party in connection with any Purchased Assets are currently underway and that no contractual rights with respect to any such third party agreements have been waived, settled or otherwise modified from the contracts as provided to Purchaser prior to the date hereof.

u. <u>No Third Party Audit Rights</u>. Vendor represents and warrants that no third party has any audit rights against Vendor in connection with the Purchased Assets, nor shall any third party have any audit rights with respect to Purchased Assets following the Closing.

4. **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Vendor the following:

10

Case 3:25-cv-00256    Document 1-2    Filed 03/04/25    Page 11 of 27 PageID #: 29

a.  <u>Organization and Existence</u>.  Purchaser is duly organized, validly existing and in good standing and has all applicable powers and all material governmental licenses, authorizations, consents and approvals required to carry on its business as now conducted.

b.  <u>Corporate Authorization</u>.  The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby are within the powers of Purchaser and have been duly authorized by all necessary action on the part of Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

c.  <u>Governmental Authorization</u>.  The execution, delivery and performance by Purchaser of this Agreement does not require any action by or in respect of, or filing with, any governmental authority.

d.  <u>Compliance with Laws.</u>  Purchaser is not in violation of, has not violated, and to the knowledge of Purchaser, is not under investigation with respect to and has not been threatened to be charged with or given notice of any violation of, any law, rule, ordinance or regulation, or judgment, order or decree entered by any governmental authority, which could reasonably be expected to have a material adverse effect on Purchaser's ability to pay the Purchase Price.

**5.  COVENANTS**

Purchaser and Vendor agree as follows:

a.  <u>Third Party Agreements – Purchaser</u>:  Upon Closing, Purchaser may exercise fully all of its rights in the collection of royalties and income related to Purchased Assets.

b.  <u>Third Party Agreements – Vendor</u>:  After the Closing, Vendor will not assign Vendor's interest in the Purchased Assets to any other performing rights organization or society other than ASCAP with respect to the Compositions or any other digital rights collection agency other than SoundExchange. Upon the expiry or termination of any third party agreement, Vendor shall notify Purchaser and await Purchaser's instructions and if Purchaser so instructs, Vendor shall execute any necessary documents to renew or extend such third party agreement, from time to time, for the full term of copyright and if Vendor fails to do so, Vendor hereby irrevocably appoints Purchaser as Vendor's attorney-in-fact solely for the purpose of renewing or extended such third party agreement(s) in Vendor's name.

c.  <u>Correspondence</u>: Following Closing, Vendor shall use commercially reasonable efforts to keep Purchaser informed, on a current basis, with respect to all correspondence and statements from parties to the Third Party Agreements and shall advise Purchaser of any claim against the Purchased Assets of which Vendor becomes aware.

11

Case 3:25-cv-00256   Document 1-2   Filed 03/04/25   Page 12 of 27 PageID #: 30

d.  <u>Further Documents</u>.  Following Closing, Vendor shall, upon Purchaser's or its successors or assigns reasonable request execute and deliver to Purchaser or its successors or assigns any other documents as may be reasonably necessary or appropriate to vest the rights granted to Purchaser in this Agreement, and Vendor hereby irrevocably appoints Purchaser as Vendor's attorney-in-fact solely for the purpose of executing those other documents in Vendor's name provided that such documents have first been received by Vendor for signing and Vendor has not done so within five (5) business days.  Each party to this Agreement, on receipt of notice from the other party, shall sign, or cause to be signed, all further documents, do, or cause to be done, all further acts, and provide all assurances as may reasonably be necessary or desirable to give effect to the terms of this Agreement.  Without limiting the foregoing, concurrently with the execution hereof, Vendor shall execute the short form assignment attached hereto as Exhibit "A" and by this reference incorporated herein.  Further, concurrently with the execution hereof, Vendor shall execute the letter of direction attached hereto as Exhibit "B" and by this reference incorporated herein.

e.  <u>Confidential Treatment</u>.  Each of Vendor and Purchaser shall, and shall instruct in writing their respective attorneys, accountants and other professional advisors to, hold in confidence and not communicate, transmit, publish, disseminate or otherwise disclose, or use in any direct or indirect manner, any of the terms and conditions of this Agreement (except as necessary in order to obtain any required third party consents) or any of the other's proprietary information, business affairs, business strategies or trade secrets, including, but not limited to, practices, procedures, client lists, pricing, computer code and systems or other information technology or product or services marketing activities or plans, or any other information reasonably considered confidential regarding the other's business learned in the course of dealing or performance hereunder (collectively, "**Confidential Information**").  Confidential Information will not include information which (a) becomes generally available to the public through no wrongful or negligent act or omission on the receiving party's part; (b) the receiving party receives from a third party free to make such disclosure without breach of any legal obligation; or (c) is required to be disclosed pursuant to any statute, regulation, order, subpoena or document discovery request (as to which the receiving party shall give the disclosing party prompt notice).  The Purchase Price shall be deemed Confidential Information.

f.  <u>Public Announcement</u>.  Following the Closing Date, Purchaser shall have the right to state that the Purchased Assets are have been acquired by Purchaser if Purchaser so elects.

g.  <u>Forwarding of Royalty Statements and Royalties</u>.  Vendor will promptly provide Purchaser with copies of any royalty statements and accounts provided to it by any third parties that relate to any periods commencing prior to, on, or after the Cash Date that are received by Vendor after the Cash Date or that relate to any income received on and after the Cash Date.  In the event that Vendor receives any income arising from or relating to the Purchased Assets on and after the Cash Date, Vendor shall forward One Hundred Percent (100%) of such income to Purchaser within thirty (30) days following Vendor's receipt of such income.  All payments from Vendor to Purchaser shall be made to a bank account,

12

the details of which shall be provided to Vendor after Closing. If the Purchaser mistakenly receives statements, royalties or other income from other properties that are not part of the Purchased Assets, it shall forward such statements and income to Vendor within thirty (30) days following Vendor's receipt of such income.

6. **INDEMNIFICATION**

a. <u>Indemnification</u>. Vendor and its executors, administrators, heirs and assigns hereby defends, indemnifies and holds the Purchaser and their respective parent companies, affiliates, subsidiaries, and their assigns (and their respective directors, officers, shareholders, members, representatives and agents) harmless from any and all actual, out-of-pocket damage, loss, liability and expense (including, without limitation, reasonable legal and court fees and expenses in connection with any action, suit or proceeding including any third party claims) (collectively, "**Loss**") incurred or suffered by them or any of them arising out of any misrepresentation or material breach of any representation, warranty, covenant or agreement made by the Vendor in this Agreement or to be performed by the Vendor pursuant to this Agreement including without limitation in connection with any third party claim arising out of the exploitation of the Purchased Assets by Vendor for any periods prior to the later of the Closing and/or the Cash Date.

b. Purchaser and its executors, administrators, heirs and assigns hereby defends, indemnifies and holds the Vendor and their respective parent company, affiliates, subsidiaries, and their assigns (and their respective directors, officers, shareholders, members, representatives and agents) harmless from any Loss incurred or suffered by them or any of them arising out of any misrepresentation or material breach of any representation, warranty, covenant or agreement made by the Purchaser in this Agreement or to be performed by the Purchaser pursuant to this Agreement including without limitation in connection with any third party claim arising out of the exploitation of the Purchased Assets by Purchaser or its parent company, affiliates, subsidiaries, and their respective assigns or licensees (and their respective directors, officers, shareholders, members, representatives and agents) for any periods commencing on, or after, the Closing.

c. The party seeking indemnification hereunder (the "**indemnified party**") must notify the party from whom indemnification is sought (the "**indemnifying party**") promptly in writing (including in such notice a brief description of the claim, including damages sought or estimated, to the extent actually known or reasonably capable of estimation by the indemnified party) (the "**Indemnification Notice**"); provided, however, that the failure to promptly provide such Indemnification Notice shall not affect the indemnification provided under this Section 6 except to the extent the indemnifying party has been actually prejudiced as a result of such failure. The indemnifying party will reimburse an indemnified party promptly after delivery of an Indemnification Notice certifying that the indemnified party has incurred Loss (together with any supporting documentation) subject to, and after compliance with, the terms of this Section 6.

13

d.  With respect to any Loss resulting from any claims by persons or entities not party to this Agreement, the indemnified party shall deliver to the indemnifying party, promptly after the indemnified party's receipt thereof, copies of all documents (including court papers) received by the indemnified party relating to the claim. The indemnifying party shall assume the defense thereof, at its own expense, with counsel selected by the indemnifying party and reasonably acceptable to the indemnified party.  If the indemnifying party assumes the defense of any claim, the indemnifying party shall not be liable to the indemnified party for legal expenses subsequently incurred by the indemnified party in connection with the defense thereof: provided, that if a material conflict of interest exists between the indemnified party, on the one hand, and the indemnifying party, on the other hand, the expense of separate counsel for the indemnified party shall be borne by the indemnifying party. The indemnifying party shall permit the indemnified party to participate in, but not control, the defense of any such action or suit through counsel chosen by the indemnified party, and the fees and expenses of such counsel, except as provided above, shall be borne by the indemnified party.  The indemnifying party shall be liable for the reasonable fees and expenses of counsel employed by the indemnified party in the defense of a claim for any period during which the indemnifying party has not assumed (or is not diligently pursuing) the defense thereof. The parties hereto shall reasonably cooperate in the defense or prosecution of any third party claim, with such cooperation to include (i) the retention of and the provision to the other party of records and information that are reasonably relevant to such claim and (ii) the making available of employees on a mutually convenient basis for providing additional information and explanation of any material provided hereunder.

e.  <u>Set Off Rights</u>.  Without limiting any of Purchaser's rights and remedies and notwithstanding anything else to the contrary contained herein, in the event that the breach of any representation or warranty, the unanticipated exercise by a third party of first refusal rights, the refusal of any third party to direct Artist Royalties to Purchaser or in the event of any other eventuality that prevents Purchaser from receiving the benefits of the Purchased Assets at materially the same level as the same was presented by Vendor with respect to the Basis Period, Purchaser shall have the right to: (i) reduce the Purchase Price in an amount commensurate with such deviation; (ii) retain payments otherwise due to Vendor in an amount commensurate with such deviation; and/or (iii) demand repayment by Vendor of an amount commensurate with such deviation, all without limiting any of Purchaser's other rights and remedies.

f.  <u>Survival</u>. Subject to the limitations and other provisions of this Agreement, the representations and warranties, covenants and agreements contained in this Agreement shall survive the Closing and shall remain in full force and effect.

**7.  TERM**

This Agreement shall become effective as of the full execution hereof.

**8.  MISCELLANEOUS**

a. <u>Assignment</u>. The Purchaser may assign this Agreement or its rights hereunder (or any of them) in whole or in part without notice or restriction provided always Purchaser has fulfilled its obligations hereunder.

b. <u>Schedules, Exhibits and </u>recitals:  All Schedules, Exhibits and recitals shall form part of this Agreement and are full, true and complete.

c. <u>Waiver</u>. The failure of either party to complain of any default by the other party or to enforce any of such party's rights, no matter how long such failure may continue, will not constitute a waiver of the party's rights under this Agreement. The waiver by either party of any breach of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other provision. No part of this Agreement may be waived except by the further written agreement of the parties.

d. <u>Governing Law and Jurisdiction</u>. This Agreement is made and shall be governed by the laws of the State of New York without regard to its conflict of laws provisions and the federal laws of the United States applicable therein. Any suit, action or proceeding arising out of or based on this Agreement, or the transactions contemplated hereby shall be instituted in the federal courts of the United States or the courts of the State of New York located in New York, New York and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

e. <u>Headings</u>. The headings of paragraphs and sections used in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement unless the context requires otherwise.

f. <u>Notices</u>. All notices and other business communications between the parties related to this Agreement shall be in writing, sent by certified or registered mail, return receipt requested and electronic mail addressed to the addresses provided hereinabove. Notices on regular business days sent by certified or registered mail, return receipt requested shall be deemed given and received on the date indicated on the return receipt. Notices sent by electronic mail shall be deemed given and received on the date transmitted and received.  Either party may change its address or electronic mail address by giving written notice in compliance with this paragraph.

g. <u>Relationship</u>. Neither party is the agent, employee, or servant of the other. Except as specifically set forth herein, neither party shall have nor exercise any control or direction over the methods by which the other party performs work or obligations under this Agreement. Further, nothing in this Agreement is intended to create any partnership, joint venture, lease, or equity relationship, expressly or by implication, between the parties with the respect to the subject matter herein.

h. <u>Entire Agreement</u>. This Agreement constitutes the final, complete and exclusive agreement between the parties with respect to its subject matter and supersedes all past and contemporaneous agreements, promises, and understandings, whether oral or written, between the parties.

15

i. <u>Unenforceable Provision</u>. The unenforceability of any part of this Agreement will not affect any other part hereof. This Agreement will be construed as if the unenforceable parts had been omitted.

j. <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties, their heirs, legal representatives, successors and permitted assigns.

k. <u>Severability</u>. In the event any provision of this Agreement is held to be invalid or unenforceable, the remainder of this Agreement shall remain in full force and effect as if the invalid or unenforceable provision had never been a part of the Agreement.

l. <u>Amendments</u>. This Agreement may not be amended or modified except in writing signed by all of the parties (or their heirs, successors or administrators) and identified as an amendment to this Agreement.

m. <u>Expenses</u>. Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

n. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each party had signed the same document. PDF, digital and facsimile signatures shall be valid and binding, and this Agreement may be delivered by electronic means.

o. <u>Independent Legal Advice</u>. Each party acknowledges and represents that in negotiating and executing this Agreement it has received advice as to its legal rights from independent third-party legal counsel and that it has read and understood all of the terms and provisions of this Agreement. Further, each party and their counsel have cooperated in the drafting and preparation of this Agreement. It shall be deemed their joint work product and may not be construed against any party by reason of its preparation.

p. <u>No Third Party Rights.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the parties to it and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third parties to any party to this Agreement, nor shall any provision give any third parties any right of subrogation over or action against any party to this Agreement.

<u>//</u>
<u>//</u>
<u>//</u>
<u>//</u>
<u>//</u>
<u>//</u>
<u>//</u>

q. <u>Currency.</u> All payments required to be made pursuant to this Agreement, including, without limitation, all amounts which in the aggregate comprise the Purchase Price, and

16

amounts stated or required to be paid in or in accordance with any indemnity provisions of this Agreement, shall be in United States dollars.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date hereof.

**SCC SPV I, LLC**

By: Authorized Signatory

**Jason Null**

# SCHEDULE "A"

## [Masters]

"J. Null - Saving Abel List of Titles (Universal)"
"18 DAYS"
"18 DAYS (LIVE AT THE HOUSE OF BLUES)"
"18 DAYS (ROCK MIX)"
"18 DAYS TOUR EP"
"ADDICTED"
"ADDICTED (ACOUSTIC)"
"ADDICTED (EDITED)"
"ADDICTED (EXPLICIT)"
"ADDICTED (LIVE AT THE HOUSE OF BLUES)"
"BEAUTIFUL DAY"
"BEAUTIFUL YOU"
"BEAUTIFUL YOU (LIVE AT THE HOUSE OF BLUES)"
"DROWNING (FACE DOWN)"
"DROWNING (FACE DOWN) (LIVE AT THE HOUSE OF BLUES)"
"DROWNING (FACE DOWN) (ROCK RADIO)"
"GOODBYE"
"IN GOD S EYES"
"IN GOD S EYES (LIVE AT THE HOUSE OF BLUES)"
"IN GOD'S EYES"
"LIVE AT THE HOUSE OF BLUES"
"MISS AMERICA"
"MISS AMERICA (RADIO MIX)"
"MISS AMERICA (TROOP VIDEO)"
"NEW TATTOO"
"NEW TATTOO (LIVE AT THE HOUSE OF BLUES)"
"OUT OF MY FACE"
"OUT OF MY FACE (LIVE AT THE HOUSE OF BLUES)"
"RUNNING FROM YOU"
"RUNNING FROM YOU (LIVE AT THE HOUSE OF BLUES)"
"SAILED AWAY"
"SAVING ABEL"
"SHE GOT OVER ME"
"STUPID GIRL (ONLY IN HOLLYWOOD)"
"THE MAKING OF ""STUPID GIRL"""
"THE MAKING OF ""STUPID GIRL"""
"THE SEX IS GOOD"
"THE SEX IS GOOD (ROCK)"
"THE SEX IS GOOD (ROCK) (LYRIC)"
"TRYING TO CLEAR MY HEAD"

18

# SCHEDULE "B"

# MUSICAL COMPOSITIONS

## Songwriters, Societies, Splits, Publishers

| Party ID: | Member Name: | Work Title | ASCAP Work ID | Interested Parties | IPI Number | Role | Society | Own% | Collect% | Registration Date | ISWC Number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1688539 | NULL JASON TODD | 15 MINUTES OF FAME | 915914245 | NULL, JASON TODD | 478082427 | CA | ASCAP | 32.50% | 32.50% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | 15 MINUTES OF FAME | 917148563 | NULL, JASON TODD | 478082427 | CA | ASCAP | 5.00% | 5.00% | 7/9/2022 | |
| 1688539 | NULL JASON TODD | ADDICTED | 313004834 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 4/2/2008 | T9013570826 |
| 1688539 | NULL JASON TODD | ADDICTED | 887061970 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.68% | 16.68% | 6/20/2014 | |
| 1688539 | NULL JASON TODD | ADDICTED ADDICTED TO YOU | 893870104 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 1/12/2018 | T9013570826 |
| 1688539 | NULL JASON TODD | AFTER ALL | 313160273 | NULL, JASON TODD | 478082427 | CA | ASCAP | 50.00% | 50.00% | 6/25/2008 | T9012400430 |
| 1688539 | NULL JASON TODD | AMAZING | 905109970 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 10/5/2019 | T9091336797 |
| 1688539 | NULL JASON TODD | ANGEL WITHOUT WINGS | 881248860 | NULL, JASON TODD | 478082427 | CA | ASCAP | 25.00% | 25.00% | 4/26/2010 | T9035776079 |
| 1688539 | NULL JASON TODD | BAPTIZE ME | 920895621 | NULL, JASON TODD | 478082427 | CA | ASCAP | 33.33% | 33.33% | 6/28/2023 | T3178666116 |
| 1688539 | NULL JASON TODD | BEAUTIFUL DAY | 323166392 | NULL, JASON TODD | 478082427 | CA | ASCAP | 21.25% | 21.25% | 7/2/2008 | T9013039468 |
| 1688539 | NULL JASON TODD | BEAUTIFUL YOU | 323166418 | NULL, JASON TODD | 478082427 | CA | ASCAP | 21.25% | 21.25% | 7/2/2008 | T9013017737 |
| 1688539 | NULL JASON TODD | BITTERSWEET | 904132574 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 10/5/2019 | T9091336786 |
| 1688539 | NULL JASON TODD | BLOOD STAINED REVOLUTION | 915913210 | NULL, JASON TODD | 478082427 | CA | ASCAP | 15.00% | 15.00% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | BLOODY SUNDAY | 881248742 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.68% | 16.68% | 4/26/2010 | T9035751598 |
| 1688539 | NULL JASON TODD | BRINGING DOWN THE GIANT | 884143642 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 6/6/2012 | T9123544978 |
| 1688539 | NULL JASON TODD | BRINGING DOWN THE GIANT | 889394554 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.66% | 16.66% | 9/23/2015 | |
| 1688539 | NULL JASON TODD | BRINGING ON THE PAIN | 918695547 | NULL, JASON TODD | 478082427 | CA | ASCAP | 7.50% | 7.50% | 11/18/2022 | T3139481822 |
| 1688539 | NULL JASON TODD | CONSTANTLY | 885428357 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 5/21/2013 | T9089450919 |
| 1688539 | NULL JASON TODD | CONTAGIOUS | 881249257 | NULL, JASON TODD | 478082427 | CA | ASCAP | 17.50% | 17.50% | 4/26/2010 | T9035763805 |
| 1688539 | NULL JASON TODD | DOWN IN FLAMES | 881248859 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.68% | 16.68% | 4/26/2010 | T9035787383 |
| 1688539 | NULL JASON TODD | DROWNING (FACE DOWN) | 342969453 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.68% | 16.68% | 7/2/2008 | T9022165191 |
| 1688539 | NULL JASON TODD | EIGHTEEN DAYS | 351727830 | NULL, JASON TODD | 478082427 | CA | ASCAP | 25.00% | 25.00% | 7/2/2008 | T9012429786 |
| 1688539 | NULL JASON TODD | FIRE | 920989490 | NULL, JASON TODD | 478082427 | CA | ASCAP | 30.00% | 30.00% | 7/5/2023 | T3186938734 |
| 1688539 | NULL JASON TODD | FROM THE DAMAGE | 921082395 | NULL, JASON TODD | 478082427 | CA | ASCAP | 33.33% | 33.33% | 7/12/2023 | T3189075643 |
| 1688539 | NULL JASON TODD | GOODBYE | 371924491 | NULL, JASON TODD | 478082427 | CA | ASCAP | 5.00% | 5.00% | 6/25/2008 | |
| 1688539 | NULL JASON TODD | GOODBYE | 904909560 | NULL, JASON TODD | 478082427 | CA | ASCAP | 5.00% | 5.00% | 10/5/2019 | T9016218807 |
| 1688539 | NULL JASON TODD | GRAVITY | 921182928 | NULL, JASON TODD | 478082427 | CA | ASCAP | 33.33% | 33.33% | 7/21/2023 | T3192196177 |
| 1688539 | NULL JASON TODD | HELL OF A RIDE | 881249303 | NULL, JASON TODD | 478082427 | CA | ASCAP | 2.50% | 2.50% | 4/26/2010 | T9049548030 |
| 1688539 | NULL JASON TODD | HELL OF A RIDE | 920351054 | NULL, JASON TODD | 478082427 | CA | ASCAP | 2.50% | 2.50% | 5/9/2023 | |
| 1688539 | NULL JASON TODD | I D DO IT AGAIN | 889373740 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 9/21/2015 | T9089450942 |
| 1688539 | NULL JASON TODD | I NEED YOU | 881248967 | NULL, JASON TODD | 478082427 | CA | ASCAP | 50.00% | 50.00% | 4/26/2010 | T9035738580 |
| 1688539 | NULL JASON TODD | I'D DO IT AGAIN | 922384610 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 11/9/2023 | T9089450942 |
| 1688539 | NULL JASON TODD | IN GOD'S EYES | 393355430 | NULL, JASON TODD | 478082427 | CA | ASCAP | 22.50% | 22.50% | 7/2/2008 | T9016233300 |
| 1688539 | NULL JASON TODD | JUST LIKE YOU | 881249212 | NULL, JASON TODD | 478082427 | CA | ASCAP | 37.50% | 37.50% | 4/26/2010 | T9035770220 |
| 1688539 | NULL JASON TODD | KILL THE RADIO | 921185432 | NULL, JASON TODD | 478082427 | CA | ASCAP | 30.00% | 30.00% | 7/21/2023 | T3192192313 |
| 1688539 | NULL JASON TODD | LET IT ALL OUT | 915915799 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | LIVING COLOR | 904125606 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 10/5/2019 | T9089451081 |
| 1688539 | NULL JASON TODD | LOADED GUN | 423884533 | NULL, JASON TODD | 478082427 | CA | ASCAP | 50.00% | 50.00% | 8/28/2009 | T9026808162 |
| 1688539 | NULL JASON TODD | LOVE LIKE SUICIDE | 915913107 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | LOVE SADISTIC | 889301192 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 9/10/2015 | T9089450975 |
| 1688539 | NULL JASON TODD | ME AND YOU | 905008206 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 10/5/2019 | T9089451036 |
| 1688539 | NULL JASON TODD | MEMPHIS | 915913829 | NULL, JASON TODD | 478082427 | CA | ASCAP | 20.00% | 20.00% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | MICHAEL JACKSON'S JACKET | 884799028 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 12/17/2012 | T9123544989 |
| 1688539 | NULL JASON TODD | MICHAEL JACKSON'S JACKET | 889395171 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 9/23/2015 | |
| 1688539 | NULL JASON TODD | MISS AMERICA | 881249395 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 4/26/2010 | T9052784675 |
| 1688539 | NULL JASON TODD | MISS AMERICA | 919733914 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 2/13/2023 | T9052784675 |
| 1688539 | NULL JASON TODD | MISS AMERICA | 922001421 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 10/9/2023 | T9052784675 |
| 1688539 | NULL JASON TODD | MISSISSIPPI MOONSHINE | 881248681 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 4/26/2010 | T9035778564 |
| 1688539 | NULL JASON TODD | MY CATASTROPHE | 904569924 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 10/5/2019 | T9089451105 |
| 1688539 | NULL JASON TODD | MYSTIFY | 887097853 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 4/26/2010 | T9132343103 |
| 1688539 | NULL JASON TODD | NBC SUNDAY NIGHT FOOTBALL CUES | 888585648 | NULL, JASON TODD | 478082427 | C | ASCAP | 16.67% | 16.67% | 4/17/2015 | T9166001565 |
| 1688539 | NULL JASON TODD | NEVER | 881248803 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 4/26/2010 | T9035766008 |
| 1688539 | NULL JASON TODD | NEVER | 905016102 | NULL, JASON TODD | 478082427 | CA | ASCAP | 20.83% | 20.83% | 10/5/2019 | T9057647219 |
| 1688539 | NULL JASON TODD | NEW LOSER | 885221007 | NULL, JASON TODD | 478082427 | C | ASCAP | 12.50% | 12.50% | 3/27/2013 | |
| 1688539 | NULL JASON TODD | NEW LOSER | 904806961 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 10/5/2019 | T9091336764 |
| 1688539 | NULL JASON TODD | NEW TATTOO | 440512107 | NULL, JASON TODD | 478082427 | CA | ASCAP | 50.00% | 50.00% | 3/4/2008 | T9017968659 |
| 1688539 | NULL JASON TODD | NOWHERE | 920366758 | NULL, JASON TODD | 478082427 | CA | ASCAP | 5.00% | 5.00% | 5/11/2023 | T3178636443 |
| 1688539 | NULL JASON TODD | ONLY HUMAN | 451605415 | NULL, JASON TODD | 478082427 | CA | ASCAP | 25.00% | 25.00% | 7/2/2008 | T9012520717 |
| 1688539 | NULL JASON TODD | OUT OF MY FACE | 451601115 | NULL, JASON TODD | 478082427 | CA | ASCAP | 37.50% | 37.50% | 6/25/2008 | |
| 1688539 | NULL JASON TODD | OUT OF MY FACE | 905646685 | NULL, JASON TODD | 478082427 | CA | ASCAP | 37.50% | 37.50% | 10/17/2019 | T9016241751 |
| 1688539 | NULL JASON TODD | PARACHUTE | 904907625 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 10/5/2019 | T9089451069 |
| 1688539 | NULL JASON TODD | PICTURES OF ELVIS | 890828219 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 7/14/2016 | T9091336775 |
| 1688539 | NULL JASON TODD | PSYCHO SEX | 922012595 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 10/10/2023 | T3215520002 |
| 1688539 | NULL JASON TODD | READY TO BURN | 915915622 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | RUNNING FROM YOU | 481984414 | NULL, JASON TODD | 478082427 | CA | ASCAP | 22.50% | 22.50% | 7/2/2008 | |

19

| Party ID: | Member Name: | Work Title | ASCAP Work ID | Interested Parties | IPI Number | Role | Society | Own% | Collect% | Registration Date | ISWC Number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1688539 | NULL JASON TODD | SECRETS | 881248912 | NULL, JASON TODD | 478082427 | CA | ASCAP | 32.50% | 32.50% | 4/26/2010 | T9035748846 |
| 1688539 | NULL JASON TODD | SECRETS | 887086397 | NULL, JASON TODD | 478082427 | CA | ASCAP | 32.50% | 32.50% | 6/26/2014 | |
| 1688539 | NULL JASON TODD | SHE GOT OVER ME | 495844316 | NULL, JASON TODD | 478082427 | CA | ASCAP | 5.00% | 5.00% | 10/26/2007 | T9127272359 |
| 1688539 | NULL JASON TODD | SHE LIKES IT ANYWHERE | 881249258 | NULL, JASON TODD | 478082427 | CA | ASCAP | 20.00% | 20.00% | 4/26/2010 | T9035771290 |
| 1688539 | NULL JASON TODD | SIDE ROADS | 915914315 | NULL, JASON TODD | 478082427 | CA | ASCAP | 25.00% | 25.00% | 3/31/2022 | T3099292709 |
| 1688539 | NULL JASON TODD | SILENT NIGHT | 894777585 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 5/21/2018 | T9272913947 |
| 1688539 | NULL JASON TODD | SPARE ME | 497403271 | NULL, JASON TODD | 478082427 | CA | ASCAP | 2.50% | 2.50% | 8/28/2009 | T9029176952 |
| 1688539 | NULL JASON TODD | STORY LINE | 497403253 | NULL, JASON TODD | 478082427 | CA | ASCAP | 17.00% | 17.00% | 8/28/2009 | T9028697407 |
| 1688539 | NULL JASON TODD | STUPID GIRL | 881248802 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.68% | 16.68% | 4/26/2010 | T9048534903 |
| 1688539 | NULL JASON TODD | STUPID GIRL (ONLY IN HOLLYWOOD) | 920348527 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 5/9/2023 | T9048534903 |
| 1688539 | NULL JASON TODD | SURVIVE | 880372118 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 9/11/2009 | T0611162663 |
| 1688539 | NULL JASON TODD | SURVIVE | 892510153 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 5/17/2017 | |
| 1688539 | NULL JASON TODD | SURVIVE | 895555970 | NULL, JASON TODD | 478082427 | CA | ASCAP | 8.33% | 8.33% | 9/11/2018 | |
| 1688539 | NULL JASON TODD | TAKE IT BACK | 904408494 | NULL, JASON TODD | 478082427 | CA | ASCAP | 12.50% | 12.50% | 10/5/2019 | T9089450964 |
| 1688539 | NULL JASON TODD | TAP OUT | 881248680 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.66% | 16.66% | 4/26/2010 | T9035745176 |
| 1688539 | NULL JASON TODD | TEAR MYSELF IN TWO | 506404831 | NULL, JASON TODD | 478082427 | CA | ASCAP | 25.00% | 25.00% | 8/28/2009 | T9026836168 |
| 1688539 | NULL JASON TODD | THE NEW FIGHT | 915914073 | NULL, JASON TODD | 478082427 | CA | ASCAP | 20.00% | 20.00% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | THE SEX IS GOOD | 881248743 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.68% | 16.68% | 4/26/2010 | T9035780304 |
| 1688539 | NULL JASON TODD | THE SEX IS GOOD | 881582965 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 7/6/2010 | |
| 1688539 | NULL JASON TODD | THE SEX IS GOOD | 887174673 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.66% | 16.66% | 7/7/2014 | |
| 1688539 | NULL JASON TODD | THOSE WHO WAIT | 894034667 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 1/29/2018 | T9089451003 |
| 1688539 | NULL JASON TODD | TOOTH AND NAIL | 881249348 | NULL, JASON TODD | 478082427 | CA | ASCAP | 10.00% | 10.00% | 4/26/2010 | |
| 1688539 | NULL JASON TODD | TRYING TO CLEAR MY HEAD | 506015412 | NULL, JASON TODD | 478082427 | CA | ASCAP | 25.00% | 25.00% | 4/24/2009 | T9020482966 |
| 1688539 | NULL JASON TODD | WE ALL FALL DOWN | 915914025 | NULL, JASON TODD | 478082427 | CA | ASCAP | 20.00% | 20.00% | 3/31/2022 | |
| 1688539 | NULL JASON TODD | WITH YOU (I THINK ABOUT YOU) | 915913537 | NULL, JASON TODD | 478082427 | CA | ASCAP | 50.00% | 50.00% | 3/31/2022 | T3099293724 |
| 1688539 | NULL JASON TODD | WORLD S JUST BURNING | 921183667 | NULL, JASON TODD | 478082427 | CA | ASCAP | 30.00% | 30.00% | 7/21/2023 | T3192196075 |
| 1688539 | NULL JASON TODD | YOU MAKE ME SICK | 897035389 | NULL, JASON TODD | 478082427 | CA | ASCAP | 16.67% | 16.67% | 4/24/2019 | T9089451047 |

Case 3:25-cv-00256    Document 1-2    Filed 03/04/25    Page 21 of 27 PageID #: 39

# SCHEDULE "C"
## SoundExchange, Inc. Master Titles

| Artist | Track Title | ISRC | SXID | Effective % | Hold | Registrant | Payee ID# | Association Type |
|---|---|---|---|---|---|---|---|---|
| Saving Abel | 15 Minutes Of Fame | TCACB1420039 | SX210M3TEL | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | 18 Days | USVI20900475 | SX2100RHMS | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | 18 Days | USVI20800331 | SX2100SSIL | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | 18 Days | USVI20800036 | SX2100S6VX | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | 18 Days | USVI20900026 | SX2100S6VY | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | 18 Days | | SX3101G3RZ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted | USVI20701296 | SX2100SCEQ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted | USVI20800235 | SX2100SFK7 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted | USVI20900478 | SX2100RHMT | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted | USVI20800352 | SX2100SCET | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted | USVI20701297 | SX2100SFK6 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted | | SX3100V4P5 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted "2008" | | SX311W3J22 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted (20On20 Clean Edit) | | SX312G2ZBN | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted (Alternative Lyric)/(Cc Clean) | | SX3102PR35 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted (Live At Sirius) | | SX310199QE | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted Ihm Cleaner | | SX312RKPJD | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Addicted(1).Mp3 | | SX3100Z7CD | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | After All | USYLB0801102 | SX210821VA | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Amazing | USKO11200920 | SX210VF4NX | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Amazing | | SX3102655L | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Angel Without Wings | USVI21000098 | SX2100R1KK | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Beautiful Day | USVI20800041 | SX2100SCES | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Beautiful You | USVI20900472 | SX2100RHMM | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Beautiful You | USVI20800044 | SX2100SCEM | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Bittersweet | USKO11200927 | SX210VF4NQ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Blood Stained Revolution | TCABZ1467008 | SX210M3TEM | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Bloody Sunday | USVI21000095 | SX2100R1KN | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Bringing Down The Giant | USKO11200918 | SX210VF4NN | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Bringing Down The Giant | | SX3100WN1L | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Bringing Down The Giant (Radio Edit) | USKO11200941 | SX210VF5CD | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Constantly | USKO11200930 | SX210VF4NZ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Contagious | USVI21000093 | SX2100R1KS | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Copy Of Addicted | | SX31004DKR | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Cut Me Right | | SX31011IRH | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Down In Flames | US6PV1300404 | SX210IAYT0 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Drowning | | SX3102NR99 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Drowning (Face Down) | USVI20900476 | SX2100RHMP | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Drowning (Face Down) | USVI20900018 | SX2100S6N6 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Drowning (Face Down) | USVI20800037 | SX2100SCEU | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Goodbye | USVI20800087 | SX2100S8AD | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Have You Ever Seen The Rain (Acoustic) | | SX311SLSNN | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Hell Of A Ride | USVI21000101 | SX2100R1KT | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | I Need You | USVI21000100 | SX2100R1KU | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | I'D Do It Again | USKO11200926 | SX210VF4NR | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | I'D Do It Again | | SX3101HKF6 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | I'M Still Alive | USVI21000096 | SX2100R1KO | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | In God'S Eyes | USVI20900471 | SX2100RHMO | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | In God'S Eyes | USVI20800039 | SX2100SCEW | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Just Like You | USVI21000158 | SX2100R1KM | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Loaded Gun | | SX3100G9SJ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Love Like Suicide | TCABW1406378 | SX210M3TEH | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Love Sadistic | USKO11201337 | SX210VF4O0 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Me And You | | SX310JX729 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Me And You | USKO11200925 | SX210VF4NS | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Michael Jackson'S Jacket | USKO11200919 | SX210VF4NM | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Miss America | USVI21100015 | SX2100QI00 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Miss America | USVI21000099 | SX2100R1KL | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Miss America Sampler | USVI21000103 | SX2100R2J9 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Mississippi Moonshine | USVI21000097 | SX2100R1KP | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | My Catastrophe | USKO11201338 | SX210VF4NY | 33.33 | No | Jason Null | 2177968350 | Artist |

21

| Artist | Track Title | ISRC | SXID | Effective % | Hold | Registrant | Payee ID# | Association Type |
|---|---|---|---|---|---|---|---|---|
| Saving Abel | Mysitify | US6PV1300401 | SX210IAYSZ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Mystify (Acoustic) | US6PV1300406 | SX210IAYT2 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Never | JX2US1244548 | SX210K15S5 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Never | USCHU1010040 | SX2100OZR6 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | New Loser | USKO11200924 | SX210VF4NT | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | New Tattoo | USVI20900474 | SX2100RHMR | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | New Tattoo | USVI20800034 | SX2100SCEL | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Only Human | USVI20800086 | SX2100SCEV | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Out Of My Face | USVI20900477 | SX2100RHMQ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Out Of My Face | USVI20800042 | SX2100SCEO | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Parachute | USKO11200929 | SX210VF4NO | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Pictures Of Elvis | USKO11200923 | SX210VF4NU | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Pictures Of Elvis | | SX3100AO5W | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Pine Mountain (The Dance Of The Poor Proud Man) | USKO11200921 | SX210VF4NW | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Running From You | USVI20900473 | SX2100RHMN | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Running From You | USVI20800043 | SX2100SCEP | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Sailed Away | USVI20800040 | SX2100SCER | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Saving Abel | | SX31015S9H | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Secrets | US6PV1300402 | SX210IAYSY | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | She Got Over Me | USVI20800035 | SX2100SCEN | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Silent Night | | SX3102U4EE | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Storyline | | SX3100BVZ9 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Stupid Girl (Only In Hol | | SX3101RGHB | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Stupid Girl (Only In Hollywood) | USVI21000057 | SX2100R1K5 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Stupid Girl (Only In Hollywood) | USVI21000055 | SX2100R1KR | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Stupid Girl (Only In Hollywood) No Piano Intro | | SX310394Q4 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Stupid Gril | | SX3101CWPW | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Stupid Gril (Only In Hollywood) | | SX31026Q1U | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Summer In The Sun | US6PV1300403 | SX210IAYT1 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Take Me Home | US6PV1300405 | SX210IAYT3 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Tap Out | USVI21000092 | SX2100R1KQ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Tear Myself In Two | | SX31013POK | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | The Sex Is Good | USVI21000200 | SX2100QUZZ | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | The Sex Is Good | USVI21000160 | SX2100QWQE | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | The Sex Is Good | USVI21000094 | SX2100QWQD | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Those Who Wait | USKO11200928 | SX210VF4NP | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Tooth And Nail | USVI21000159 | SX2100R1K4 | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | Trying To Clear My Head | USVI20800234 | SX2100S8AE | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | You Make Me Sick | USKO11200922 | SX210VF4NV | 33.33 | No | Jason Null | 2177968350 | Artist |
| Saving Abel | You Make Me Sick | | SX3102CCGZ | 33.33 | No | Jason Null | 2177968350 | Artist |

22

<u>**EXHIBIT "A"**</u>

**ASSIGNMENT OF PURCHASED ASSETS**

DATED:                              As of August 5, 2024 (the "**Effective Date**")

ASSIGNOR(S):                **Jason Null p/k/a "Saving Abel"**

ASSIGNEES:                   **SCC SPV I, LLC**


WHEREAS, Assignor and Assignee have entered into a certain Purchase Agreement, effective as of the Effective Date (the "**Purchase Agreement**"), pursuant to which, among other things, Assignor has agreed to sell, assign and transfer all of its rights, title and interests in, and Assignee has agreed to accept, the Purchased Assets (as defined below);

AND WHEREAS Assignee now desires to memorialize and confirm its ownership of the Purchased Assets in the form of this Assignment.

NOW THEREFORE, for valuable consideration, subject to the terms of the Purchase Agreement, Assignor hereby assigns, transfers, sets over and conveys to Assignee the Purchased Assets.  "**Purchased Assets**" means the following assets, rights and property of the Vendor:

i.      all right, title and interest to Vendor's interests in the Artist Royalties as outlined in the Recording Agreements, including, without limitation, the rights to receive income and statements, audit Skiddco and UMG as applicable;

ii.     all right, title and interest to Vendor's interests in the Writer Royalties as set forth in the BMG Agreement, including, without limitation, the rights to receive income and statements, audit BMG and the like;

iii.    subject only to the BMG Agreement, all right, title and interest in and to the Compositions, including, without limitation, the copyright therein and thereto and all extensions, renewals, reversions and other rights thereof and appurtenant thereto;

iv.     all ASCAP Writer's Share Income earned from the Compositions as set forth on Schedule "B" attached hereto;

v.      All SoundExchange Income from the master recordings set forth on Schedule "C" attached hereto;

vi.     all renewals, modifications and extensions of the underlying agreements giving rise to the royalty streams related to the Purchased Assets as outlined above;

vii.      all reversionary and recapture rights in the Purchased Assets now known or hereafter coming into force;

viii.      all audit rights related to the Purchased Assets for income generated or received after the Cash Date;

ix.      all royalties and income or accounts receivable arising from the exploitation of the Purchased Assets that are received during any periods commencing on or after the Cash Date, including any income received by Vendor on or after the Cash Date; and

x.      subject to applicable laws and to the extent available and in possession and control of the Vendor, all royalty statements, records and files relating solely and specifically to above; provided however that where by law the Vendor is required to retain a royalty statement, book or record, it shall retain such item and deliver to the Purchaser a copy thereof;

all for the life of copyright or the term of such rights and any renewals and extensions thereof (whether presently available or subsequently available as a result of intervening legislation) throughout the World, and all of the proceeds from the foregoing received during any periods commencing on, and after, the Cash Date.

IN WITNESS WHEREOF, the undersigned has executed this Assignment as of the date above written.

AGREED AND ACCEPTED BY THE ASSIGNOR:

**Jason Null**

24

**EXHIBIT "B"**

Dated as of August 5, 2024

To Whom It May Concern

This is to advise you that Jason Null p/k/a "Saving Abel" **("Seller")** have entered into an agreement with SCC SPV I, LLC ("**Stilwell**") wherein Seller's interest in certain assets as specified in the attached Exhibit "A" (the "**Purchased Assets**") and all income from such Purchased Assets have been assigned to Stilwell, and that your records should be marked to provide all statements and royalties in respect thereof to:

874 Broadway, #807<br>
New York, NY 10003

or such other address as Stilwell may direct following the date hereof, which hereafter become payable with respect to exploitations of the Purchased Assets occurring following the date hereof.

Any consents and authorizations that Seller may have under the agreement between you and Seller relating to the Purchased Assets have also been assigned to Stilwell. Effective as of the date hereof, Stilwell has assumed and agrees to pay, perform, fulfill and discharge, within the time such payment or performance is due, and in such a manner as may be required, all obligations Seller may have under the agreement between you and Seller with respect to the Purchased Assets except for obligations that arose prior to the date hereof.

Effective date: June 1, 2024

Very truly yours,

**SCC SPV I, LLC**

By: Authorized Signatory

**Jason Null**

25

EXHIBIT C

## Consent of Spouse

I, Tesslia Ann Null, spouse of Jason Null ("**Vendor**"), acknowledge that I have read the Asset Purchase Agreement, dated as of August 5, 2024, by and among Vendor and SCC SPV I, LLC, to which this Consent of Spouse is attached as Exhibit "C" (as the same may be amended or amended and restated from time to time, the "**Agreement**"), and that I understand the contents of the Agreement. I am aware that my spouse is a party to the Agreement and the Agreement contains provisions regarding the transfer of the Purchased Assets (as defined in the Agreement) which my spouse may own, including any interest I might have therein.

I hereby consent to the execution by my spouse of the Agreement and agree that I and any interest, including any community property interest, that I may have in any Purchased Assets subject to the Agreement shall be irrevocably bound by the Agreement. I hereby irrevocably appoint my spouse as my attorney-in-fact and agent with respect to the exercise of any rights and obligations under the Agreement.

I represent and warrant that I have not pledged or otherwise encumbered any interest I may have in the Purchased Assets and shall look solely to my spouse with respect to any rights I may have had with respect to the Purchased Assets pursuant to the Agreement.

This consent shall be binding on my executors, administrators, heirs, and assigns. I agree to execute and deliver such documents as may be necessary to carry out the intent of the Agreement and this consent.

I am aware that the legal, financial, and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right. I am under no disability or impairment that affects my decision to sign this consent and I knowingly and voluntarily intend to be legally bound by this consent. I am satisfied with the terms of this consent and I understand and have received full disclosure of all the rights that I am agreeing to waive. I hereby agree that my spouse may join in any future amendment, waiver, consent, or modification of the Agreement without any further signature, acknowledgment, agreement, or consent on my part or notice to me.

Dated to be effective on June 1, 2024.

**Tesslia Ann Null**